IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF VIRGINIA
ROANOKE DIVISION

| | |
|---|---|
| GREGORY LEON HAMMER, ) | |
| ) | |
| Plaintiff, ) | Case No. 7:20cv00526 |
| ) | |
| v. ) | **MEMORANDUM OPINION** |
| ) | |
| BARRY MUNSEY, *et al.*, ) | By:   Hon. Thomas T. Cullen |
| ) | United States District Judge |
| Defendants. ) | |

Gregory Leon Hammer, a Virginia inmate proceeding *pro se*, filed this action under 42 U.S.C. § 1983, against medical and other staff at Middle River Regional Jail ("Middle River"), alleging that they failed to provide him with constitutionally adequate medical care concerning his seizures. Dr. Hereford has moved for summary judgment, arguing that Hammer has not established that he was deliberately indifferent to a serious medical need.[1] After reviewing the evidence, the court agrees and will grant his motion.

## I.

### A. Hammer's Complaint

In his third amended complaint, Hammer argues that the defendants were deliberately indifferent to his serious medical condition because they discontinued his prescription for gabapentin as treatment for his alleged seizures.

---

[1] On March 22 and 25, 2022, the court granted Dr. Ottolini's motion for summary judgment and Physician Assistant ("PA") Ober's motion to dismiss. (*See* ECF Nos. 141, 142, 148, & 149.) In addition, PA Munsey has filed a motion to dismiss (ECF No. 153), and Director Nicholson and Nurse Chestnut have moved for summary judgment (ECF Nos. 56 & 58). The court will address those motions separately.

Hammer states that on November 27, 2018, he was treated for a seizure at Augusta Health Center ("Augusta Health"), a local hospital, and his anti-seizure medications of gabapentin[2] and Keppra[3] were "re[]newed."[4] (ECF No. 80, at 2.) Hammer states that these two prescriptions were brought with him when he entered Middle River that same day. Hammer claims that he continued to receive his prescriptions for gabapentin and Keppra from November 2018 through June 2019.

On June 25, 2019, Hammer alleges that he saw Dr. Hereford, and Dr. Hereford informed him that gabapentin had become a controlled substance and was being discontinued at Middle River. Hammer claims that Dr. Hereford said that only inmates who had been prescribed gabapentin for seizures would continue to receive it. Hammer alleges that he advised Dr. Hereford that he had been prescribed gabapentin to treat his seizures and that Dr. Hereford asked who had "custody of his [medical] records supporting [Hammer's assertion that] gabapentin [was prescribed] for his seizures." (ECF No. 80, at 2.) Hammer states that he told Dr. Hereford that the Virginia Department of Corrections had custody of his medical records and that, without the gabapentin, he would "start having seizures again." (*Id.*) Dr. Hereford told Hammer that he would "check the records and [have] staff review for confirmation [that the] gabapentin [was prescribed] for seizures." (*Id.*) Dr. Hereford ordered

---

[2] Gabapentin is anticonvulsant or antiepileptic drug. *See* WebMD, Gabapentin, https://www.webmd.com/drugs/2/drug-14208-8217/gabapentin-oral/gabapentin-oral/details (last visited Mar. 30, 2022). It is used with other medications to prevent and control seizures. *Id.* It is also used to relieve nerve pain. *Id.*

[3] Keppra is an anticonvulsant. *See* WebMD, Keppra, https://www.webmd.com/drugs/2/drug-18053/keppra-oral/details (last visited Mar. 30, 2022). It is used to treat seizures (epilepsy) and may decrease the number of seizures a person has. *Id.*

[4] Medical records reflect that Hammer had a "possible seizure." (*See* ECF No. 103-4, at 9.) The treating physician noted that he believed that Hammer "likely had a fictitious seizure." (*Id.*)

a taper of Hammer's gabapentin prescription, with it terminating on July 1, 2019. Hammer's prescription for Keppra, another anti-seizure medication, remained in effect. Hammer states that in August 2019, he stopped taking the Keppra because it was "ineffective and was making him vomit." (*Id.* at 3.)

Hammer does not allege that he saw or was treated by Dr. Hereford after the June 25 appointment. But he did see and receive treatment from other medical staff, none of whom re-prescribed him gabapentin, even after seeing his medical records from other institutions.

### B. Dr. Hereford's Motion for Summary Judgment

In support of his motion for summary judgment, Dr. Hereford filed a declaration and Hammer's pertinent medical records. Dr. Hereford avers that he was employed as a medical doctor at Middle River until July 31, 2019, approximately 30 days after Hammer's prescription for gabapentin had been terminated. (Decl. of Lee Hereford ¶ 1, May 16, 2021 [ECF No. 103-1].) Hammer was only referred to Dr. Hereford three times from the time he was booked in November 2018 until Dr. Hereford's last date of employment at the end of July. (*Id.* ¶ 43.) It was only at his June 25, 2019, visit that Hammer "express[ed] concern over his gabapentin prescription."[5] (*Id.*)

Dr. Hereford states that Hammer arrived at Middle River for booking in November 2018 with an active gabapentin prescription from Augusta Health. (*Id.* ¶ 46.) According to Dr. Hereford, on March 5, 2019, the Virginia General Assembly passed an amendment to Virginia Code § 54.1-3454 that added gabapentin to the list of Class V controlled substances, stating

---

[5] Dr. Hereford saw Hammer in the medical unit for unrelated issues on April 23 and May 9, 2019. (Hereford Decl. ¶ 29.) Hammer did not mention seizures or seizure medication at these appointments. (*Id.*)

that it "has a depressive effect on the nervous system." (*Id.* ¶ 7.) Prior to March 5, 2019, Dr. Hereford asserts that "gabapentin was classified as a less serious 'drug of concern.'" (*Id.*)

Due to this change in classification—and because of the potential for abuse—gabapentin prescriptions to Middle River inmates were "treated with increased scrutiny" beginning in the spring of 2019. (*Id.* ¶ 7.) Dr. Hereford states that Hammer's prescription for gabapentin was renewed regularly at Middle River until June 2019, when a review of Hammer's medical chart revealed that there was insufficient documentation of Hammer's alleged seizure disorder to warrant continuing his prescription for gabapentin, "as opposed to other non-addictive, noncontrolled seizure drugs like Keppra."[6] (*Id.* ¶ 46.)

On June 25, 2019, Dr. Hereford saw Hammer in the medical unit regarding his gabapentin prescription. (*Id.* ¶ 34.) This was the first and only time Hammer was referred to Dr. Hereford for his gabapentin and seizure concerns. (*Id.*) Hammer stated that he was put on gabapentin at Johns Hopkins over 30 years prior, after other medications failed to treat his seizures. (*Id.*) Dr. Hereford noted that Hammer had been having various correctional facilities fill this prescription since then. (*Id.*) Dr. Hereford says he explained to Hammer the change in status of gabapentin to a narcotic and that Hammer "understood" but argued that he needed to have it "prescribed at the 1000 mg thrice daily dose to survive." (*Id.*) At that time, Hammer was on 300 mg thrice daily and stated he "felt the difference." (*Id.*) Dr. Hereford noted that

---

[6] While Hammer's records from Western State Hospital reflected a prescription for gabapentin, the reason for prescription was not noted. (*Id.* ¶ 46.) Hammer's Central State Hospital records indicated that he was not prescribed any medication for his alleged seizure disorder and that gabapentin was only prescribed for chronic pain. (*Id.*) Dr. Hereford states that it appeared from Hammer's other outside medical records that the gabapentin prescription was based on *Hammer's* reports that he needed the drug, not on objective neurological testing or on a neurologist's recommendation. (*Id.*)

he would check Hammer's records and have staff review the confirmation of this prescription for seizures. (*Id.*) Dr. Hereford states that he was unable to confirm that this medication was prescribed for seizures, and he noted that he would continue Hammer on the 300 mg thrice daily dose until confirmation or "for one month more." (*Id.*)

Dr. Hereford states that gabapentin is an addictive drug that that has "high value to and is widely abused by prison populations because it induces euphoria." (*Id.* ¶ 6.) Dr. Hereford asserts that he had "significant concerns" about Hammer's potential to abuse gabapentin. (*Id.* ¶ 5.) Hammer has a history of substance abuse and documented instances of drug-seeking behaviors that created a concern that Hammer would abuse gabapentin if the prescription were continued.[7] (*Id.* ¶ 47.) Dr. Hereford states that common signs of substance abuse are (1) a constant preoccupation with the drug, (2) unease at the thought of the drug

---

[7] On multiple occasions since his incarceration at Middle River, medical staff noted that Hammer had a history of substance abuse and misuse of medication. For example, on November 30, 2018, a psychiatrist treating Hammer noted that Hammer "makes several requests for highly desirable/traded medications" and has a history of substance abuse. (*Id.* ¶ 13.) On December 17, 2018, a psychiatrist at Western State Hospital noted that Hammer has a history of cocaine, methamphetamine, marijuana, and alcohol abuse, and that his history of seizures was "in question." (*Id.* ¶ 17.) On December 19, 2018, Hammer's mental health counselor expressed hesitation about moving Hammer to a different housing unit because Hammer was institutionally charged with hoarding his medications. (*Id.* ¶ 18.)

On January 11, 2019, Hammer attempted to get a psychiatrist to prescribe him specific medication and the psychiatrist noted that he was "mindful of Greg's risk for misusing meds and h[istory] of reactivity." (*Id.* ¶ 19.) The psychiatrist noted that Hammer should be monitored for misuse. (*Id.*)

On February 2, 2019, Hammer was seen by his psychiatrist for reports that he had been "cheeking" medications. (*Id.* ¶ 21.) The psychiatrist noted that Hammer was "on several highly desirable/potentially traded meds (gabapentin, bupropion, and quetiapine) all provided by outside providers. Greg has several R[isk] F[actors] for medication misuse/abuse." (*Id.*) On February 8, 2019, Hammer's psychiatrist discontinued a medication after Hammer refused to accept it in crushed form after reports that he was "cheeking" the medication. (*Id.* ¶ 22.) On February 20, 2019, Hammer saw a psychiatrist to discuss Hammer's history of "cheeking" medication. (*Id.* ¶ 23.) Hammer at first denied the allegations of "cheeking," saying he merely "pulled medication" out of his mouth but then "apologized and attempted to negotiate his medication." (*Id.*) Hammer's psychiatrist reported that on February 26, 2019, Hammer's cell was shaken down and that, during the search, a small bag filled with miscellaneous pills fell out of Hammer's waist band. (*Id.* ¶ 24.)

On March 3, 2019, Hammer's psychiatrist noted that Hammer "simply cannot be trusted. . . . Clearly, Greg was misusing meds and possibly illicit substances as well. He is obviously high risk to trade meds, divert them, or abuse them." (*Id.* ¶ 25.) The psychiatrist further noted that he would no longer prescribe high value medications or those that carry an elevated risk of misuse. (*Id.*)

being unavailable, (3) lying about or exaggerating symptoms to doctors, and (4) hoarding or "cheeking" medication, especially in a prison population. (*Id.*) Dr. Hereford asserts that Hammer exhibited an "unusual preoccupation" with gabapentin even though he was prescribed another non-addictive anti-seizure medication that should have provided him some relief had he taken it as prescribed. (*Id.* ¶ 48.) Hammer was observed "cheeking" gabapentin on January 27, 2019, and May 7, 2019. (Hereford Decl. ¶ 10.) Hammer was repeatedly put on pill-call restrictions (i.e., crushed medications only) because he had been caught hoarding and "cheeking" medication, including gabapentin. (*Id.* ¶ 48.) Hammer's hoarding behaviors led his psychiatrist to discontinue all psychiatric medication with a high risk for abuse or trading. (*Id.*) Dr. Hereford avers that Hammer's psychiatrist documented many warnings that Hammer was "not to be trusted" and that he was at a "high risk to abuse or divert his medications." (*Id.*)

Dr. Hereford states that, even though Hammer's prescription for gabapentin was discontinued, his prescription for Keppra remained in effect. (*Id.* ¶ 45.) Although Hammer often refused his Keppra doses, Dr. Hereford states that Hammer never told him that Keppra caused him nausea. (*Id.*) Although nausea is not a recognized side effect of Keppra, Dr. Hereford states that he could have prescribed a non-addictive drug with low potential for abuse to treat any nausea Hammer experienced if Hammer had told him about the nausea. (*Id.*)

Finally, Dr. Hereford avers that until he left employment at Middle River at the end of July 2019, Hammer did not have a documented, confirmed seizure at Middle River.[8] (*Id.* ¶ 44.)

---

[8] On December 8, 2018, Hammer was examined by a nurse after Hammer was found non-responsive in his cell. (*Id.* ¶ 14.) Hammer's vitals were normal, and the nurse placed an ammonia tablet under Hammer's nose which roused him. (*Id.*) Dr. Hereford states that ammonia tablets are used in the prison setting to distinguish

Dr. Hereford never observed Hammer have a seizure and, other than the complaint about the discontinuation of Hammer's gabapentin prescription, Hammer never sought treatment for seizures from Dr. Hereford. [9] (*Id.*)

Dr. Hereford argues that he "exercised the degree of skill and diligence practiced by a reasonably prudent physician in the Commonwealth of Virginia." (*Id.* ¶ 49.)

## II.

Federal Rule of Civil Procedure 56(a) provides that a court should grant summary judgment "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." "As to materiality, . . . [o]nly disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). Summary judgment is inappropriate "if the dispute about a material fact is 'genuine,' that is, if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Id.*; *see also JKC Holding Co. v. Wash. Sports Ventures, Inc.*, 264 F.3d 459, 465 (4th Cir. 2001). But if the evidence of a genuine issue of material fact "is merely colorable or is not significantly probative, summary judgment may be granted." *Anderson*, 477 U.S. at 249-50 (internal citations omitted).

---

legitimate seizures and unconsciousness from feigned seizures and unconsciousness. (*Id.*) If an inmate rouses with the use of an ammonia tablet, he "likely was not unconscious or experiencing a seizure." (*Id.*) If an inmate does not rouse with the use of an ammonia tablet, the unconsciousness was "likely legitimate." (*Id.*) Dr. Hereford states that because Hammer roused with the ammonia capsule, "his unconsciousness was likely feigned." (*Id.*) Dr. Hereford notes, however, that he was not involved in the December 8 encounter and was not informed of it until this lawsuit was filed. (*Id.*)

[9] Dr. Hereford states that upon reviewing Hammer's medical chart, it appears that the first time Hammer was seen in the medical unit for reports of a seizure was on July 27, 2020—over one year after his prescription for gabapentin was discontinued on July 1, 2019, and almost one year *after* Dr. Hereford left employment with Middle River. (*Id.* ¶ 44.)

In considering a motion for summary judgment under Rule 56, a court must view the record as a whole and draw all reasonable inferences in the light most favorable to the nonmoving party. *See id.* at 255; *Shaw v. Stroud*, 13 F.3d 791, 798 (4th Cir. 1994). The non-moving party may not rely on beliefs, conjecture, speculation, or conclusory allegations to defeat a motion for summary judgment. *Baber v. Hosp. Corp. of Am.*, 977 F.2d 872, 874-75 (4th Cir. 1992). The evidence relied on must meet "the substantive evidentiary standard of proof that would apply at a trial on the merits." *Mitchell v. Data Gen. Corp.*, 12 F.3d 1310, 1315-16 (4th Cir. 1993) ("The summary judgment inquiry thus scrutinizes the plaintiff's case to determine whether the plaintiff has proffered sufficient proof, in the form of admissible evidence, that could carry the burden of proof of his claim at trial."); *Sakaria v. Trans World Airlines*, 8 F.3d 164, 171 (4th Cir. 1993) (finding that the district court properly did not consider inadmissible hearsay in an affidavit filed with motion for summary judgment).

### III.

Hammer alleges that Dr. Hereford failed to provide adequate medical treatment for his seizures because he terminated and did not re-prescribe gabapentin. The court concludes, however, that Hammer has not established that Dr. Hereford was deliberately indifferent to a serious medical need and, therefore, the court will grant Dr. Hereford's motion for summary judgment.

To establish a cognizable Eighth Amendment claim for denial of medical care, a plaintiff must put forth facts sufficient to demonstrate that an official was deliberately indifferent to a serious medical need. *Estelle v. Gamble*, 429 U.S. 97, 105 (1976); *Conner v. Donnelly*, 42 F.3d 220, 222 (4th Cir. 1994); *Staples v. Va. Dep't of Corr.*, 904 F. Supp. 487, 492

(E.D. Va. 1995). A prison official is "deliberately indifferent" only if he or she "knows of and disregards an excessive risk to inmate health or safety." *Farmer v. Brennan*, 511 U.S. 825, 837 (U.S. 1994).

"[M]any acts or omissions that would constitute medical malpractice will not rise to the level of deliberate indifference." *Jackson v. Lightsey*, 775 F.3d 170, 178 (4th Cir. 2014). An "error of judgment" on the part of prison medical staff or "inadvertent failure to provide adequate medical care," while perhaps sufficient to support an action for malpractice, does not constitute a constitutional deprivation redressable under § 1983. *Boyce v. Alizaduh*, 595 F.2d 948, 953 (4th Cir. 1979), *abrogated on other grounds by Neitzke v. Williams*, 490 U.S. 319 (1989). Mere negligence does not constitute deliberate indifference; rather, a prison official must both be aware of the facts from which the inference could be drawn that a substantial risk of harm exists and must draw the inference. *Johnson v. Quinones*, 145 F.3d 164, 167 (4th Cir. 1998); *see also Farmer*, 511 U.S. at 837. The prison official's conduct must be so grossly incompetent, inadequate, or excessive as to shock the conscience or to be intolerable to fundamental fairness. *Militier v. Beorn*, 896 F.2d 848, 851 (4th Cir. 1990).

Further, "prisoners do not have a constitutional right to the treatment of his or her choice." *King v. United States*, 536 F. App'x 358, 362-63 (4th Cir. 2013) (unpublished) (cleaned up). A claim concerning a mere disagreement between an inmate and medical personnel regarding diagnosis or course of treatment does not implicate the Eighth Amendment. *Wright v. Collins*, 766 F.2d 841, 849 (4th Cir. 1985); *Russell v. Sheffer*, 528 F.2d 318, 319 (4th Cir. 1975); *Harris v. Murray*, 761 F. Supp. 409, 414 (E.D. Va. 1990). Questions of medical judgment are ordinarily not subject to judicial review. *Russell v. Sheffer*, 528 F.2d 318 (4th Cir. 1975). With

respect to prescription medications, a prisoner's "dissatisfaction with the course of his treatments and the doctors' decisions about which medications may be prescribed does not implicate a constitutional violation." *Conrad v. Akers*, No. 7:10cv560, 2011 U.S. Dist. LEXIS 97420, *27 (W. D. Va. 2011) (citing *Estelle*, 429 U.S. at 104).

Middle River changed its policy concerning gabapentin beginning in the spring of 2019, after the medication was classified as a controlled substance. As a result, Gabapentin prescriptions to Middle River inmates were treated with "increased scrutiny" and were only permitted for inmates who were prescribed the medication for treatment of seizures. A review of Hammer's medical chart in June 2019 revealed that there was "insufficient documentation" of Hammer's alleged seizure disorder to warrant continuing his prescription for gabapentin. Accordingly, Dr. Hereford ordered the tapering of Hammer's gabapentin. Dr. Hereford met with Hammer on June 25, 2019, the day the tapering began, and explained the change in Middle River's policy. When Hammer advised Dr. Hereford that his gabapentin prescription was to treat his seizures, Dr. Hereford agreed to have staff obtain his medical records for further review. Hammer's prescription for gabapentin terminated on July 1, 2019, but he still had a prescription for Keppra, another anti-seizure medication. There is no indication that Dr. Hereford reviewed any medical records that demonstrated that Hammer should be prescribed gabapentin before Dr. Hereford left employment at Middle River 30 days later, on July 31, 2019. In fact, other staff who subsequently reviewed Hammer's medical records and requests for gabapentin also denied him the medication. In addition to not having available medical records to support the gabapentin prescription, Hammer still had a prescription for Keppra, Hammer had no documented history of seizures at Middle River, and Dr. Hereford was

legitimately concerned about prescribing the "addictive" medication to Hammer given his history of substance abuse and misuse of medications.

Having reviewed the entire record, nothing suggests that Dr. Hereford's treatment of Hammer was "so grossly incompetent, inadequate, or excessive as to shock the conscience or to be intolerable to fundamental fairness." *Militier*, 896 F.2d at 851. Although Hammer may have desired a different course of treatment, his disagreement with Dr. Hereford's treatment plan is not actionable under § 1983. The court, therefore, cannot find that Dr. Hereford was deliberately indifferent to a serious medical need of Hammer.

## IV.

For the reasons stated, the court will grant Dr. Hereford's motion for summary judgment.

The clerk is directed to forward a copy of this Memorandum Opinion and accompanying Order to the parties.

**ENTERED** this 31st day of March, 2022.

*/s/ Thomas T. Cullen*
HON. THOMAS T. CULLEN
UNITED STATES DISTRICT JUDGE