IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF VIRGINIA
ROANOKE DIVISION

GREGORY LEON HAMMER,       )
                                   )
      Plaintiff,            )       Civil Action No. 7:20cv00526
                                   )
v.                              )       **MEMORANDUM OPINION**
                                   )
NURSE CHESTNUT, *et al.*,      )       By:    Hon. Thomas T. Cullen
                                   )              United States District Judge
      Defendants.        )

Gregory Leon Hammer, a Virginia inmate proceeding *pro se*, filed this action under 42 U.S.C. § 1983, against medical and other staff at Middle River Regional Jail ("Middle River"), alleging that they failed to provide him with, or interfered with him receiving, constitutionally adequate medical care concerning his seizures and failed to supervise medical staff regarding the same. Nurse Chestnut and Major Nicholson, Director of Support Services, have moved for summary judgment,[1] arguing that Hammer's claims against them fail as a matter of law.[2] After reviewing the evidence, the court agrees and will grant their motion.

---

[1] The court previously dismissed their motions for summary judgment after Hammer filed a third amended complaint. (*See* ECF No. 79.) The court gave the defendants the opportunity to file new motions. While the other defendants filed new motions, Nurse Chestnut and Maj. Nicholson filed a notice of their intent to rely on the arguments in their previously filed briefs in support of their motions for summary judgment. (*See* ECF No. 89.) The court construes their notice (ECF No. 89) as a motion for summary judgment, supported by their original briefs in support (ECF Nos. 57 & 59). The court notes that a notice, required by *Roseboro v. Garrison*, 528 F.2d 309, 310 (4th Cir. 2005), was sent to Hammer after the defendants filed their notice, and Hammer was given the opportunity to respond. (*See* ECF No. 93.)

[2] The court already granted Dr. Ottolini, Dr. Hereford, and PA Munsey's motions for summary judgment and PA Ober's motion to dismiss. (*See* ECF Nos. 141, 142, 148, 149, 152, 153, 197, & 198.)

## I.

### A. Hammer's complaint

In his verified third amended complaint, Hammer alleges that on November 27, 2018, he was treated for a seizure at Augusta Health Center ("Augusta Health"), a local hospital, and his anti-seizure medications of gabapentin[3] and Keppra[4] were "re[]newed."[5] (3d Am. Compl. at 2 [ECF No. 80].) Hammer alleges that he brought those two prescriptions with him when he entered Middle River later that day. Hammer claims that he continued to receive the prescriptions for gabapentin and Keppra at Middle River from November 2018 through June 2019.

In June 2019, Hammer alleges that medical staff informed him that gabapentin had become a controlled substance and was "being discontinued" at Middle River. (*Id.*) Medical staff ordered a taper of Hammer's gabapentin prescription, with it terminating on July 1, 2019. Hammer's prescription for Keppra remained in effect.

At an appointment with the doctor on June 25, 2019, Hammer claims that the doctor told him that only inmates who had been prescribed gabapentin for seizures would continue to receive gabapentin. Hammer claims that he advised the doctor that his prescription for gabapentin was to treat his seizures and requested that staff obtain his medical records from

---

[3] Gabapentin is anticonvulsant or antiepileptic drug. *See* WebMD, Gabapentin, https://www.webmd.com/drugs/2/drug-14208-8217/gabapentin-oral/gabapentin-oral/details (last visited Sept. 20, 2023). It is administered with other medications to prevent and control seizures. *Id.* It is also used to relieve nerve pain. *Id.*

[4] Keppra is an anticonvulsant. *See* WebMD, Keppra, https://www.webmd.com/drugs/2/drug-18053/keppra-oral/details (last visited Sept. 20, 2023). It is used to treat seizures (epilepsy) and may decrease the number of seizures a person has. *Id.*

[5] Medical records reflect that Hammer had a "possible seizure." (*See* ECF No. 103-4, at 9.) The treating physician noted that he believed that Hammer "likely had a fictitious seizure." (*Id.*)

Augusta Health and the Virginia Department of Corrections ("VDOC") to confirm this. Hammer claims that the doctor informed him that he would "check the records and [have] staff review for confirmation [that the] gabapentin [was prescribed] for seizures." (*Id.*) Hammer states that his subsequent "pleas" for staff to obtain his medical records "went ignored." (*Id.* at 3.) In August 2019, Hammer stopped taking Keppra because he felt it was "ineffective and was making him vomit." (*Id.*)

In July 2020, more than a year after his gabapentin prescription had been discontinued, Hammer alleges that he informed a Physician's Assistant ("PA") that he had been having seizures "because the Keppra without the gabapentin was ineffective for antiepileptic therapy," and that he had tried a "host of anti-seizure medications, but the gabapentin/Keppra combination was . . . the only effective antiepileptic therapy for him."[6] (*Id.*) Hammer claims that the PA stated that he did not have medical records to support prescribing both medications. Hammer states that he advised the PA that without the gabapentin/Keppra combination, he would "be subjected to additional seizures and be at further risk of suffering serious injuries therefrom."[7] (*Id.*)

In August 2020, Hammer states that he informed a doctor that he had been having seizures "because the Keppra without the gabapentin was ineffective for his antiepileptic therapy." (*Id.* at 4.) He also advised the doctor that he had tried a "host of other antiseizure medications" but the gabapentin and Keppra combination "was found to be the only effective

---

[6] Middle River's medical records reflect that Hammer was not seen in the medical department for reports of seizure activity from January 2019 through July 2020, even though he had not taken gabapentin since July 1, 2019, and had not taken Keppra since August 2019. (*See* ECF No. 59-1 at 25-49.)

[7] Middle River's medical records reflect that Hammer's Keppra prescription was restarted after this appointment. (*See* ECF No. 59-1 at 49.)

antiepileptic therapy for him." (*Id.*) Hammer claims that the doctor stated that, if there were medical records that documented a neurologist prescribing Hammer gabapentin for his seizures, he would "be happy to discuss re-starting the gabapentin." (*Id.*) Hammer alleges that he told the doctor that both the VDOC and Augusta Health had records showing that he was prescribed the gabapentin and Keppra combination for antiepileptic therapy.

Hammer claims that on September 24, 2020, the doctor reviewed Hammer's medical records from Augusta Health and "again refused to re-start the gabapentin/Keppra combination."[8] (*Id.*) Hammer alleges that he continued to suffer seizures.

Hammer asserts that on October 6, 2020, "despite [Hammer's] ongoing seizure episodes,"[9] defendant Nurse Chestnut "medical[ly] cleared" Hammer and he was "moved out of his camera cell in [the] medical observation [unit] to another housing unit into a cell without a camera for medical observation." (3d Am. Compl. at 4.) Hammer claims that two days later, he was "found on the floor of his cell[,] unresponsive [and] with injuries to his face." (*Id.* at 5.) Hammer was moved back into a medical observation cell with a camera.

---

[8] He also submits an affidavit stating that on January 20, 2021 (after all of his medical records had been received by Middle River), a PA at Middle River reviewed his neurology reports and determined that Hammer's prescription for Keppra without gabapentin was appropriate. (G. Hammer Aff. ¶ 16, June 17, 2021 [ECF No. 111-1].) The court notes that Hammer was transferred to a VDOC facility in March 2021 (*see* ECF No. 81) and started complying with his prescription for Keppra without the gabapentin (*see* ECF No. 126 at 2). In October 2021, Hammer had a neurology consult at the Virginia Commonwealth University and a nurse practitioner there recommended that Hammer's prescription for gabapentin be restarted to treat his epilepsy. (*See* ECF No. 126-1.) It is unclear whether VDOC medical staff followed the nurse practitioner's recommendation. This October 2021 "new development" does not change the outcome of this case, though.

[9] Middle River's medical records reflect that Hammer's last seizure before this date was on September 20, 2020. (*See* ECF No. 59-1 at 20.)

- 4 -

Hammer claims that, to no avail, he "spoke in person and wrote" to defendant Maj. Nicholson, requesting her assistance in obtaining "proper medical treatment for his epilepsy." (*Id.*)

Hammer argues that Nurse Chestnut denied him access to adequate medical treatment for his seizures by delaying the collection of his medical records from other facilities. He also argues that she denied him adequate medical treatment by medically clearing him on October 6. Finally, he argues that Maj. Nicholson failed to adequately supervise the medical department, resulting in him being denied adequate medical treatment for his alleged seizures.

**B. Nurse Chestnut and Maj. Nicholson's motion for summary judgment**

In support of their motion for summary judgment, Nurse Chestnut and Maj. Nicholson filed declarations as well as Hammer's pertinent medical records and requests. Nurse Chestnut is a registered nurse at Middle River. Major Nicholson is the Director of Support Services at Middle River, and her duties include overseeing the medical department to ensure that inmates have access to medical care.

**1.   Nurse Chestnut's declaration**

Nurse Chestnut avers that, although Hammer claims to have seizures, "there are no objective findings in his medical record that confirm [he] actually has a seizure disorder." (R. Chestnut Decl. ¶ 4, Feb. 1, 2021 [ECF No. 59-1].) According to Chestnut, all of Hammer's reports of seizures are self-reports, no neurological studies in his chart revealed definitive evidence of a seizure disorder, and, as far as she knows, no medical professional has observed Hammer having a confirmed seizure. Hammer's medical records include records from Western State Hospital ("Western State") (received at Middle River on December 17, 2018),

Central State Hospital ("Central State") (received June 19, 2019), Augusta Health (received September 14, 2020), the University of Virginia ("UVA") (received November 13, 2020), the VDOC (received November 17, 2020), and the Valley Community Services Board ("Valley") (received on an unknown date).

Hammer's VDOC records include an EEG report from 2015. Nurse Chestnut states that this is "the only neurological study report" in Hammer's Middle River medical chart or records obtained from other facilities.[10] (*Id.* ¶ 5.) The results of the study were "normal" and reflected that Hammer "exhibited no epileptiform activity." (*Id.*) The VDOC's records also indicate that Hammer was prescribed gabapentin for nerve issues and that he was prescribed only Keppra for seizures.[11] Nurse Chestnut also states that the VDOC medical records indicate that past trials of gabapentin for Hammer's seizures had failed[12] and that Central State's records indicate that although he had a "remote history of seizures," Hammer was taking gabapentin for chronic pain only and he was not taking any medicine for seizures. (*Id.*) Nurse Chestnut also notes that the doctor who evaluated Hammer at Augusta Health just before he was incarcerated at Middle River had noted that Hammer's seizure "was likely factitious, meaning artificially created, and found no need for a workup." (*Id.* ¶ 6.) In March 2018, a psychiatrist noted that Hammer "had been diagnosed with malingering and would

---

[10] Nurse Chestnut notes that Hammer's UVA records refer to an older UVA telemedicine note that references an EEG that may have been performed at St. Mary's Hospital in 2001, but the UVA records do not state whether Hammer was diagnosed with a seizure disorder based on this EEG, and the UVA neurologist "withheld a final seizure diagnosis for further testing." (*Id.* FN 1.)

[11] It appears he was given the Keppra prescription for his self-reported seizures.

[12] Hammer summarily disputes this specific VDOC record by arguing that it was "erroneously recorded or documented" in 2014, but he does not provide any evidence in support of this assertion. (ECF No. 194 at 3.)

feign illness in efforts to manipulate staff." (*Id.* ¶ 7.) Nurse Chestnut also asserts that Central State's records reported that Hammer "admittedly would engage in self-harmful behaviors to receive attention and manipulate staff." (*Id.*)

Nurse Chestnut attests that the first time she became aware that Hammer was seeking his medical records was when he submitted a medical request on June 26, 2019, asking Middle River to obtain his records from other providers. According to Chestnut, if a doctor or a PA orders outside medical records to be obtained, it is the duty of the nurse accompanying the doctor or PA to ensure that the records are requested and obtained. Nurse Chestnut states that she "had little clinical interaction with" Hammer and "was never present when a physician ordered that [Hammer's] records be obtained." (*Id.* ¶ 8.) She also states that she was not aware of any orders to obtain Hammer's medical records from another facility. In response to his June 26 medical request, Nurse Chestnut advised Hammer that they had received his medical records from Central State.

According to Nurse Chestnut, even though Middle River did not receive all of Hammer's medical records until November 2020, none of the records indicate that gabapentin is necessary to treat Hammer's seizures. Nurse Chestnut notes that, even after receiving these records, no doctor at Middle River prescribed gabapentin to Hammer. She contends that any delay in acquiring the records, therefore, did not affect Hammer's desired gabapentin prescription.

Nurse Chestnut states that the first time Hammer was seen in the medical department at Middle River for reports of seizure activity was in late July 2020, more than a year after his prescription for gabapentin was discontinued. From August to early October 2020, Hammer

was assigned to restrictive housing for medical observation because there were not enough beds in the medical department. Nurse Chestnut states that restrictive housing is near the medical unit and is often used for overflow medical housing if beds are not available in the medical unit. Inmates housed in the medical unit and in the medical overflow housing are observed by camera and the cameras are monitored by correctional officer staff, not medical staff.[13] Nurse Chestnut avers that, although the cameras are always on, they are not continuously monitored, because the correctional officers must apportion their time among various duties. Whether an inmate is housed in the medical unit or in the medical overflow (where Hammer was housed), medical staff do not have a direct line of sight to each inmate. According to Nurse Chestnut, if an inmate were to have a seizure while in the medical unit or in the medical overflow housing, the monitoring correctional staff would have to recognize the seizure, communicate their observations to medical staff, and medical staff would then respond to the inmate's cell. While Hammer was housed in the restrictive housing, when staff were able to review Hammer's alleged seizures on video footage, "they noted on several instances that the behavior did not appear indicative of a genuine neurological disturbance and that his behavior appeared deliberate." (*Id.* ¶ 7; ECF No. 59-1 at 24−25.) Nurse Chestnut never observed Hammer exhibit seizure activity.

While he was in restrictive housing, Nurse Chestnut attests that Hammer "repeatedly requested to be moved to a cell with a television," but restrictive housing cells do not have television access and there were no available beds in the medical unit. (*Id.* ¶ 12.) In response to his requests, on October 6, Nurse Chestnut cleared Hammer to be removed from the

---

[13] Medical staff, however, may review video footage from the cameras if the need arises.

medical unit. She states that at the time she made the decision, she "believed that [Hammer] had been placed in the medical overflow [housing] because he reported having seizures," he had not reported any seizures in more than a week (since September 20), and inmates are generally kept in the medical unit for only a few days following a seizure. (*Id.* ¶ 13.) Chestnut notes that Hammer had an active Keppra prescription, but states that she was not aware that he had been noncompliant with his medication at the time of she cleared him[14] and was not aware of any provider's order that he be kept in the medical unit.[15] In addition, Chestnut states that, although she cleared him from the restrictive housing medical overflow, she is not involved in making housing assignments or movement decisions, and she did not make the decision to assign Hammer to general population housing.

On October 8, 2020, Hammer was found lying face down in his cell by a correctional officer. After he did not respond to the officer's questions, the officer radioed for assistance. When backup arrived, Hammer sat up and claimed that he had had a seizure. The medical department was notified, and medical staff responded. The nurse noted a "slight red scratch" on his left cheek and left side of his forehead, but there was no indication that these scratches

---

[14] A year earlier, on September 5, 2019, Chestnut emailed Maj. Nicholson to report that Hammer had been refusing his Keppra medication unless he also received the gabapentin. It appears that after Hammer repeatedly refused to take the Keppra, the prescription was removed from his medications. A doctor re-prescribed Keppra beginning on July 30, 2020. The medical records indicate that Hammer repeatedly refused to take the Keppra after the prescription was restarted in 2020. It appears the last time he refused Keppra before his October 6 medical clearance was on September 30, 2020, one week before he was moved to a general population cell. (*See* ECF No. 59-1 at 21.)

[15] According to Middle River's medical records, on August 31 and September 24, 2020, a doctor directed that Hammer should be kept in the medical department if he was non-compliant with his Keppra prescription. (ECF No. 59-1 at 22, 23.) But a doctor's note on October 1, 2020, five days prior to his medical clearance, did not say anything about Hammer's non-compliance or give any direction that he should be kept in the medical department. There are also no notations in the medical record that Hammer refused his Keppra prescription after the October 1 doctor's note.

required any medical intervention. (*Id.* ¶ 15.) No other injuries were noted, his pants were dry[16], and he was alert to time, name, and place. Nurse Chestnut states that Hammer did not ask to go to the hospital and did not ask for any other treatment. The responding nurse placed Hammer in a restrictive housing cell with a camera so that he could be monitored by staff. For the rest of October, Hammer refused to allow his vitals to be checked daily (except October 27 and 28), and six days into his placement in medical housing, Hammer asked nursing staff what he needed to do to be cleared from medical again. Nurse Chestnut attests that there is "no objective medical evidence" confirming that Hammer actually suffered a seizure on October 8 and, even if he did, his housing assignment would not have impacted whether he had a seizure. Chestnut argues that, at most, being placed in medical (or medical overflow) housing may have increased the potential of a quicker response time in the event correctional staff observed purported seizure activity. She further argues that there is no indication that there was any delayed response by medical to Hammer's cell in general population and that, even if there was a marginal delay, there is no evidence of any substantial harm caused by any delay.

### 2. Maj. Nicholson's declaration

Although part of her job duties includes overseeing Middle River's medical department, Maj. Nicholson attests that she is not a medical provider and cannot prescribe medication, order a doctor or nurse to prescribe certain medication, or order a doctor or nurse to adopt a particular course of treatment. Instead, her role is to "ensure that inmates have access to care

---

[16] Which apparently is significant, as patients undergoing seizures sometimes experience incontinence. *See* Matt Smith, *Types of Seizures*, WebMD (Nov. 27, 2022), https://www.webmd.com/epilepsy/types-of-seizures-their-symptoms (last visited September 27, 2023).

and not to dictate the specific care each inmate should receive." (L. Nicholson Decl. ¶ 4, Jan. 27, 2021 [ECF No. 57-1].)

Maj. Nicholson states that on August 16, 2019, she received an email from a Middle River lieutenant, updating her on Hammer's status, after he had refused to eat. The lieutenant told her that Hammer was "trying to obtain his seizure medication, but that medical pulled his records and the physician's notes showed that he did not need them." (*Id.* ¶ 5.) The lieutenant did not specify which medication Hammer was seeking but told her that "[f]or now, he [wa]s good." (*Id.*)

On September 5, 2019, Nurse Chestnut sent Maj. Nicholson an email stating that Hammer had been refusing medication for seizures unless he was prescribed his preferred medication, but the specific medication was not identified. "It was noted that he was being offered his medication as prescribed but that [Hammer] had been caught hoarding and cheeking medication."[17] (*Id.* ¶ 6.) Maj. Nicholson sent an email stating that the Multi-disciplinary Team ("MDT") should be advised of this information at their next meeting.[18] Another lieutenant emailed Maj. Nicholson and advised that Hammer had been hoarding and refusing to take his medication, although the specific medication again was not disclosed. "It was noted that [Hammer] was exhibiting 'high-risk' behavior and that he was reviewed weekly by the jail's [MDT]." (*Id.*)

---

[17] Hammer counters that he "never cheeked or hoarded medication." (Hammer Aff. ¶ 13.) His medical records at Middle River repeatedly reference instances of him "cheeking," spitting, hoarding, and discarding his medications. (*See* ECF No. 59-1, at 25, 37, 41, 42, 46, & 48.) This factual dispute, although noted, is not material to the determinative issues before the court.

[18] The MDT is "a group of jail officials from different departments who work together to craft solutions to difficult inmate issues." (*Id.*)

On February 19, 2020, Nurse Chestnut emailed with Maj. Nicholson and others concerning Hammer's bunk assignment. Nurse Chestnut notes that, although Hammer had reported having seizures and claimed that he needed gabapentin for them, he had not been prescribed gabapentin for a long time and had not had any seizures. The next day, Nurse Chestnut sent Maj. Nicholson another email, stating that there was a note in Hammer's medical chart that said that he must provide documentation of his seizure activity to be approved for a bottom-bunk assignment, that he had not had any documented seizures, and that he was not on any medication for seizures at that time.

On July 28, 2020, Hammer sent Maj. Nicholson a letter requesting that his gabapentin and Keppra prescriptions be restarted to treat his alleged seizure disorder. Hammer states that in the time since his prescriptions were discontinued, he "had a couple of seizures, but [he] thought [he] would be alright because [he] anticipated being released from jail."[19] (*Id.* ¶ 9.)

On July 29, 2020, Maj. Nicholson had an in-person conversation with Hammer; two days later, she wrote to him to follow-up on the conversation. Maj. Nicholson advised Hammer that she had relayed his information regarding his medication to the medical department and she recommended that he make an appointment with the doctor to discuss his concerns.

On August 3, 2020, Hammer sent Maj. Nicholson another letter stating the doctor refused to prescribe him gabapentin for his seizures and only prescribed him Keppra, but that Keppra would not effectively treat his seizures without gabapentin and that his VDOC records would confirm this. Maj. Nicholson attests that this was the first time that Hammer had

---

[19] It appears that Hammer was not seen in the medical department for any of these alleged seizures.

referred her to his VDOC medical records. Maj. Nicholson responded, stating that Hammer was last seen in the medical department on July 30, 2020, and that he she had explained to him on "numerous occasions" that he should discuss his medical issues with the medical providers. (*Id.* ¶ 12.) She also instructed him to put in an inmate request for a medical appointment.

On August 9, 2020, Hammer sent Maj. Nicholson another letter that repeated the same information as the August 3 letter and also claimed that he had had a seizure "a few days before" and that, when he was booked at Middle River, he had a prescription for gabapentin. (*Id.* ¶ 13.)

On August 10, 2020, Hammer appealed a grievance complaining that he was not prescribed gabapentin for his seizures. Maj. Nicholson responded, stating that Nurse Chestnut had already answered the grievance, the issue was already addressed, he was seen by a provider on July 30, he should direct any further questions to the doctor, and he should fill out a medical request.

On August 16, 2020, Hammer wrote to Maj. Nicholson stating that he had had a seizure on August 15, that the seizures were stress related, and that his recent conviction was causing him increased stress. Hammer acknowledged that he was told he was on the list to see a doctor, but claimed his current seizure medication was not effective at preventing seizures and made him vomit. Hammer requested to watch TV to reduce his stress levels.

On August 17, 2020, Maj. Nicholson received a shift report that noted that Hammer was seen in medical for a potential seizure. Maj. Nicholson forwarded the report to Nurse Chestnut who responded and advised her that Hammer "was seen by a nurse and the video

of his cell indicated he did not have a seizure." (*Id.* ¶ 16.) Maj. Nicholson confirmed with Nurse Chestnut that this incident was documented in Hammer's medical record.

On August 18, 2020, Maj. Nicholson sent Hammer a letter stating that his seizure medication issues had been addressed on several occasions, directing him to the medical department and to follow through with the inmate medical request system so that his concerns could be addressed by the jail doctor, and advising him that his request to be housed in a medical overflow cell would be addressed by the medical department.

On August 24, 2020, a lieutenant emailed Maj. Nicholson to inform her that Hammer had claimed to have suffered another seizure and hurt his back when he had fallen onto the cell floor. The lieutenant confirmed that Hammer was evaluated by medical staff. A shift report addressing the incident indicated that the video footage of his cell showed that it was "very clear that [Hammer] faked his fall." (*Id.* ¶ 18.) The officer who took the report believed that Hammer was "attempting to obtain more pain medication." (*Id.*) The next day, Hammer sent Maj. Nicholson a letter telling her about the alleged seizure on August 24 and that he hurt his back. He also complained that Keppra without gabapentin was not effective in treating his seizures and that his VDOC records would confirm this. Maj. Nichols responded by reminding him that she had spoken with him on several occasions about his medication concerns, assuring him that his concerns were forwarded to Nurse Chestnut to be reviewed by the doctor, and encouraging him to make an appointment with the doctor if he still had concerns. Maj. Nicholson informed Hammer that she could not override the doctor's diagnosis or dictate the medication the doctor prescribes.

On September 14, 2020, Hammer wrote to Maj. Nicholson requesting that she "transfer him to the VDOC because he was not receiving the proper medication to treat his alleged seizure disorder." (*Id.* ¶ 21.) Maj. Nicholson responded by referring Hammer to a letter from the superintendent stating that "it is the responsibility of the medical professionals to determine [Hammer's] appropriate course of treatment and that he could not dictate to the medical professionals the course of treatment [Hammer] should be receiving." (*Id.* ¶ 22.) Maj. Nicholson again encouraged Hammer to discuss his medical issues with medical staff.

Maj. Nicholson avers that although Hammer claims he sent her many requests through Middle River's Inmate Request System, prior to the filing of his second amended complaint in this action (in December 2020), she did not receive, review, or respond to any of the inmate requests he claims he sent to her. Maj. Nicholson explains that inmate requests are handled by the individual departments most suited to handle an inmate's request. For example, when an inmate submits a request regarding medical treatment, the requests are reviewed by the medical department. Nicholson states that "[o]nly rarely" does she review or respond to any inmate requests. (*Id.* ¶ 23.)

Maj. Nicholson also attests that she did not discontinue, interfere with, or refuse to re-prescribe Hammer's seizure medication; she never prescribed Hammer any medication; and she never requested that Hammer produce any medical records to avoid discontinuation of his gabapentin prescription. As a "non-medical administrative employee," Maj. Nicholson states that she does "not have the authority to prohibit or approve a particular medication or course of treatment for an inmate." (*Id.* ¶ 25.)

Maj. Nicholson argues that although Hammer wrote to her on several occasions complaining of his seizure medication and otherwise complaining that his medical treatment was inadequate, she responded appropriately in each instance. She informed the medical department of his complaints and ensured that he was being seen by medical staff and a doctor; she promptly responded to his letters and met with him in person; she instructed him several times on how to access medical treatment if he believed that he needed it; she ensured that available video footage of his alleged seizures was preserved for the doctor to review; and she explained to him that she could not override a doctor's orders and that he needed to direct his complaints to a doctor.

## II.

Federal Rule of Civil Procedure 56(a) provides that a court should grant summary judgment "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." "As to materiality, . . . [o]nly disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). Summary judgment is inappropriate "if the dispute about a material fact is 'genuine,' that is, if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Id.*; *see also JKC Holding Co. v. Wash. Sports Ventures, Inc.*, 264 F.3d 459, 465 (4th Cir. 2001). But if the evidence of a genuine issue of material fact "is merely colorable or is not significantly probative, summary judgment may be granted." *Anderson*, 477 U.S. at 249−50 (internal citations omitted).

In considering a motion for summary judgment under Rule 56, a court must view the record as a whole and draw all reasonable inferences in the light most favorable to the nonmoving party. *See id.* at 255; *Shaw v. Stroud*, 13 F.3d 791, 798 (4th Cir. 1994). The non-moving party may not rely on beliefs, conjecture, speculation, or conclusory allegations to defeat a motion for summary judgment. *Baber v. Hosp. Corp. of Am.*, 977 F.2d 872, 874−75 (4th Cir. 1992). The evidence relied on must meet "the substantive evidentiary standard of proof that would apply at a trial on the merits." *Mitchell v. Data Gen. Corp.*, 12 F.3d 1310, 1315−16 (4th Cir. 1993) ("The summary judgment inquiry thus scrutinizes the plaintiff's case to determine whether the plaintiff has proffered sufficient proof, in the form of admissible evidence, that could carry the burden of proof of his claim at trial."); *Sakaria v. Trans World Airlines*, 8 F.3d 164, 171 (4th Cir. 1993) (finding that the district court properly did not consider inadmissible hearsay in an affidavit filed with motion for summary judgment).

## III.

Hammer alleges that Nurse Chestnut interfered with his ability to receive adequate medical treatment for his seizures by delaying Middle River's procurement of his medical records from other facilities. He also contends that she denied him adequate medical treatment when she medically cleared him on October 6. The court concludes, however, that Hammer has not established that Chestnut was deliberately indifferent to a serious medical need, or that any delay caused him serious harm. Therefore, the court will grant the defendants' motion for summary judgment as to these claims.

The government is required to provide medical care for incarcerated individuals, but not "every claim by a prisoner [alleging] that he has not received adequate medical treatment

states a violation of the [Constitution]." *Estelle v. Gamble*, 429 U.S. 97, 103−105 (1976). To establish a cognizable Eighth Amendment claim for denial of medical care, a plaintiff must put forth facts sufficient to demonstrate that an official was deliberately indifferent to a serious medical need. *Id.* at 105; *Conner v. Donnelly*, 42 F.3d 220, 222 (4th Cir. 1994); *Staples v. Va. Dep't of Corr.*, 904 F. Supp. 487, 492 (E.D. Va. 1995). A serious medical need is "one that has been diagnosed by a physician as mandating treatment or one that is so obvious that even a lay person would easily recognize the necessity for a doctor's attention." *Jackson v. Lightsey*, 775 F.3d 170, 178 (4th Cir. 2014) (internal quotation marks omitted). A prison official is "deliberately indifferent" only if he or she "knows of and disregards an excessive risk to inmate health or safety." *Farmer v. Brennan*, 511 U.S. 825, 837 (1994).

"[M]any acts or omissions that would constitute medical malpractice will not rise to the level of deliberate indifference." *Jackson*, 775 F.3d at 178. An "error of judgment" on the part of prison medical staff or "inadvertent failure to provide adequate medical care," while perhaps sufficient to support an action for malpractice, does not constitute a constitutional deprivation redressable under § 1983. *Boyce v. Alizaduh*, 595 F.2d 948, 953 (4th Cir. 1979), *abrogated on other grounds by Neitzke v. Williams*, 490 U.S. 319 (1989). And mere negligence does not constitute deliberate indifference; rather, a prison official must both be aware of the facts from which the inference could be drawn that a substantial risk of harm exists and must draw the inference. *Johnson v. Quinones*, 145 F.3d 164, 167 (4th Cir. 1998); *see also Farmer*, 511 U.S. at 837. The prison official's conduct must be so grossly incompetent, inadequate, or excessive as to shock the conscience or to be intolerable to fundamental fairness. *Militier v. Beorn*, 896 F.2d 848, 851 (4th Cir. 1990).

Further, "prisoners do not have a constitutional right to the treatment of his or her choice." *King v. United States*, 536 F. App'x 358, 362−63 (4th Cir. 2013) (internal citations omitted). But a mere disagreement between an inmate and medical personnel regarding diagnosis or the appropriate course of treatment does not (typically) implicate the Eighth Amendment. *Wright v. Collins*, 766 F.2d 841, 849 (4th Cir. 1985); *Russell v. Sheffer*, 528 F.2d 318, 319 (4th Cir. 1975); *Harris v. Murray*, 761 F. Supp. 409, 414 (E.D. Va. 1990). Questions of medical judgment are not subject to judicial review. *Russell v. Sheffer*, 528 F.2d 318 (4th Cir. 1975).

To be sure, intentional delay of, or interference with, medical treatment can amount to deliberate indifference, *see Formica v. Aylor*, 739 F. App'x 745, 755 (4th Cir. 2018); *Jett v. Penner*, 439 F.3d 1091, 1096 (9th Cir. 2006), but the Fourth Circuit has held that there is "no Eighth Amendment violation unless 'the delay results in some substantial harm to the patient,' such as a 'marked' exacerbation of the prisoner's medical condition or 'frequent complaints of severe pain.'" *Formica*, 739 F. App'x at 755 (citing *Webb v. Hamidullah*, 281 F. App'x 159, 166-67 (4th Cir. 2008)); *see also Shame v. S.C. Dep't of Corr.*, 621 F. App'x 732, 734 (4th Cir. 2015) ("A delay in treatment may constitute deliberate indifference if the delay exacerbated the injury or unnecessarily prolonged an inmate's pain." (internal quotation marks omitted)). Substantial harm may also be "'a lifelong handicap or permanent loss.'" *Coppage v. Mann*, 906 F. Supp. 1025, 1037 (E.D. Va. 1995) (quoting *Monmouth Co. Corr. Inst. Inmates v. Lanzaro*, 834 F.2d 326, 347 (3d Cir. 1987)). "[T]he length of delay that is tolerable depends on the seriousness of the condition and the ease of providing treatment." *Id.* at 758 (quoting *McGowan v. Hulick*, 612 F.3d 636, 640 (7th Cir. 2010)) (emphasis added).

## A. Delay in obtaining medical records

The evidence in the record conclusively establishes that Nurse Chestnut first became aware that Hammer was seeking his medical records when he submitted a medical request on June 26, 2019, asking Middle River to obtain his medical records from other providers. On that date, Middle River had already received Hammer's medical records from Western State (on December 17, 2018) and Central State (on June 19, 2019). Chestnut responded to Hammer's request and advised him that Middle River had received his medical records from Central State.

The evidence also establishes that Nurse Chestnut was not present when any physician ordered that Hammer's medical records be obtained. Chestnut explained that when a medical provider orders outside medical records to be obtained, it is the duty of the nurse accompanying that provider to ensure that the records are requested and obtained. Nurse Chestnut also attests that she was not aware of any order by a doctor or PA to obtain Hammer's medical records from another facility. Based on the evidence, the court cannot conclude that Nurse Chestnut intentionally delayed or interfered with the acquisition of Hammer's medical records.

But even if Nurse Chestnut had intentionally delayed the medical records, there is no evidence it the record to show that it affected Hammer's medical treatment. Hammer was not seen in the medical department for any reports of seizures between early January 2019 and late July 2020—a period of approximately 17 months. Hammer's remaining medical records were received by Middle River in September and November 2020, including records from Augusta Health (on September 14, 2020), UVA (on November 13, 2020), and the VDOC (on

November 17, 2020).[20] Even after Middle River received all of Hammer's medical records in November 2020 and medical staff had reviewed them, the doctors and PAs at Middle River still did not prescribe gabapentin to Hammer. Accordingly, even if the delay in acquiring the records could be attributed to Nurse Chestnut, the delay did not affect Hammer's gabapentin prescription and did not cause any substantial harm. Based on the record, the court cannot conclude that Nurse Chestnut was deliberately indifferent to a serious medical need of Hammer. Nurse Chestnut is, therefore, entitled to summary judgment as to this claim.

### B. Medically clearing Hammer on October 6

The evidence also conclusively establishes that, when Nurse Chestnut medically cleared Hammer on October 6, he had not had any reported seizure activity for 16 days (since September 20) and that it was routine practice to hold an inmate in the medical unit for a few days following a seizure. Nurse Chestnut states that she was not aware that Hammer was not currently complying with his Keppra prescription or that a doctor had ordered him to remain in the medical housing. Hammer argues that Middle River's medical records show that Hammer was not complying with his medication and the doctor had directed his continued housing in the medical unit if he remained non-compliant with his Keppra prescription, but the most recent doctor's note before Nurse Chestnut cleared Hammer did not mention that Hammer was not compliant with the Keppra prescription and did not direct that Hammer should be kept in medical housing. In addition, there were no notations that Hammer had failed to comply with his Keppra prescription for the week prior to his clearance. In any event, Hammer has not demonstrated that Nurse Chestnut knew of and disregarded any serious risk

---

[20] Middle River also received records from Valley on an unknown date.

of harm posed by allowing him to be transferred out of the medical department. Hammer has not shown that whether he was housed in the medical housing, medical overflow housing, or general population had any effect on whether he would have had the alleged seizure on October 8. And regardless of where he was housed, the response to his alleged seizure would require correctional officer staff to observe the seizure (or aftermath), report their observations to medical staff, and for medical staff to respond to provide any necessary medical treatment. The evidence establishes that even the cells with cameras in the medical unit and overflow housing are not continuously monitored. The only difference his housing assignment could have had on his treatment would be the speed at which medical staff could potentially respond to purported seizure activity based on their proximity to his cell.

In this instance, there is no evidence that there was a significant delay in the time it took for medical staff to respond to Hammer's alleged seizure, and Hammer has not shown that he suffered any significant harm or risk of harm. At most, he suffered two minor abrasions that did not require any medical treatment. Based on the evidence, the court cannot conclude that Nurse Chestnut was deliberately indifferent to any serious medical need.[21] Therefore, the court will grant summary judgment as to this claim.

---

[21] To the extent Hammer's claim can be construed as a cruel and unusual living conditions claim, it fails for the same reasons. The Eighth Amendment protects prisoners from cruel and unusual living conditions. *Rhodes v. Chapman*, 452 U.S. 337, 347 (1981). To plead such a claim requires facts showing that: (1) objectively, the deprivation was sufficiently serious, in that the challenged, official acts caused denial of "the minimal civilized measure of life's necessities"; and (2) subjectively, the defendant prison officials acted with "deliberate indifference to inmate health or safety." *Farmer v. Brennan*, 511 U.S. 825, 834 (1994). To satisfy the first element, the prisoner must show "significant physical or emotional harm, or a grave risk of such harm," resulting from the challenged conditions. *Shakka v. Smith*, 71 F.3d 162, 166 (4th Cir. 1995). To show deliberate indifference, the plaintiff must show that the prison official actually knew of and disregarded the serious risk of harm posed by the conditions. That standard is the equivalent of "subjective recklessness as used in the criminal law." *Farmer*, 511 U.S. at 839. "[P]rison officials who actually knew of a substantial risk to inmate health or safety may be found free from liability if they responded reasonably to the risk, even if the harm ultimately was not averted." *Id.* at 844. "It not enough that [officials] should have recognized it; they actually must have perceived

# V.

Hammer argues that Maj. Nicholson failed to adequately supervise the medical department resulting in him being denied adequate medical treatment. Hammer has not demonstrated that Maj. Nicholson was deliberately indifferent to or tacitly authorized any offensive practice, and his claim of supervisory liability against Maj. Nicholson fails. Maj. Nicholson is, therefore, entitled to summary judgment as to this claim.

It is well established that a supervisory government official cannot be held liable under § 1983 for the actions of his subordinates solely based on the doctrine of *respondeat superior*. *Monell v. Dep't of Soc. Servs.*, 436 U.S. 658, 690–92 (1978). Nonetheless, a supervisory official may be liable for his subordinate's acts if the supervisor himself bears personal responsibility for those acts. *Ashcroft v. Iqbal*, 556 U.S. 662, 676 (2009). "Liability in this context is not premised on *respondeat superior*, but on a recognition that supervisory indifference or tacit authorization of subordinates' misconduct may be a causative factor in the constitutional injuries they inflict on those committed to their care." *Slakan v. Porter*, 737 F.2d 368, 372 (4th Cir. 1984).

To prevail on a claim for supervisory liability, a plaintiff must satisfy the so-called "*Shaw* elements":

> (1) that the supervisor had actual or constructive knowledge that [his] subordinate was engaged in conduct that posed "a pervasive and unreasonable risk" of constitutional injury to citizens like the plaintiff; (2) that the supervisor's response to that knowledge was so inadequate as to show "deliberate indifference to or tacit authorization of the alleged offensive practices"; and (3) that

---

the risk." *Parrish v. Cleveland*, 372 F.3d 294, 303 (4th Cir. 2004). Based on the evidence, the court cannot conclude that Nurse Chestnut was deliberately indifferent, that Hammer suffered any significant harm or risk of harm, or that Hammer was denied "the minimal civilized measure of life's necessities." *Farmer*, 511 U.S. at 825.

> there was an "affirmative causal link" between the supervisor's inaction and the particular constitutional injury suffered by the plaintiff.

*Wilkins v. Montgomery*, 751 F.3d 214, 226 (4th Cir. 2014) (quoting *Shaw v. Stroud*, 13 F.3d 791, 799 (4th Cir. 1994)). Establishing a "pervasive" and "unreasonable" risk of harm under the first element requires evidence that the conduct is widespread, or at least has been used on several different occasions, and that the conduct engaged in by the subordinate poses an unreasonable risk of harm of constitutional injury. *Slakan v. Porter*, 737 F.2d 368, 373−74 (4th Cir. 1984). A plaintiff may establish deliberate indifference by demonstrating a supervisor's "continued inaction in the face of documented widespread abuses." *Id.* at 373. Overall, "[t]he plaintiff . . . assumes a heavy burden of proof in supervisory liability cases," for "[h]e must not only demonstrate that the prisoners face a pervasive and unreasonable risk of harm from some specified source, but he must show that the supervisor's corrective inaction amounts to deliberate indifference or 'tacit authorization of the offensive [practices].'" *Id.* at 372 (quoting *Orpiano v. Johnson*, 632 F.2d 1096, 1101 (4th Cir. 1980)) (alteration in original). "[H]e cannot satisfy [this] burden of proof by pointing to a single incident or isolated incidents." *Id.*

Hammer's allegations fall well short of establishing the *Shaw* elements against Maj. Nicholson. It is uncontroverted that Nicholson is not a medical professional and that she relies on the judgment of Keen Mountain's medical staff in determining and treating an inmate's medical needs. Her job, to put it simply, is to make ensure that Middle River inmates have *access to* medical care; it is not to determine what type of care that they receive. She does not have the authority to prohibit or approve a particular medication or course of treatment for an inmate.

The evidence also shows that Maj. Nicholson regularly corresponded with medical staff when issues related to Hammer came to her attention, and each time Hammer reached out to her, she responded to his complaints. She informed the medical department of his complaints and ensured that he was being seen by medical staff and a doctor; she responded to his letters and met with him in person; she instructed him several times on how to access medical treatment if he felt he needed further treatment; and she ensured that available video footage of his alleged seizures was preserved for the doctor to review.  Based on the record, the court cannot conclude that Maj. Nicholson was deliberately indifferent to, or tacitly authorized, any denial or delay of Hammer's medical treatment. To the contrary, the undisputed facts lead to the ineluctable conclusion that Maj. Nicholson fully satisfied her administrative duties vis-à-vis Hammer and his purported medical needs. Accordingly, the court will grant the defendants' motion for summary judgment as to this claim.

## V.

For the reasons stated, the court will grant the defendants' motion for summary judgment.[22]

The Clerk is directed to forward a copy of this Memorandum Opinion and accompanying Order to the parties.

**ENTERED** this 27th day of September, 2023.

/s/ Thomas T. Cullen
HON. THOMAS T. CULLEN
UNITED STATES DISTRICT JUDGE

---

[22] Because the court concludes that all § 1983 claims must be dismissed, the court declines, under 28 U.S.C. § 1367(c), to exercise supplemental jurisdiction over any state law claims that Hammer has asserted. The court will dismiss any asserted state law claims without prejudice to Hammer's ability to reassert them in a state court case.